ATLAS CONSTRUCTION COMPANY, a Wyoming corporation, Atlas, Inc., a Wyoming corporation, and Francis Ferguson, Appellants (Defendants),

v.

Dale R. SLATER, Jr., Appellee (Plaintiff).

No. 86–245.

Supreme Court of Wyoming.

Nov. 12, 1987.

Harold F. Buck of Kline, Buck & Asay, Cheyenne, for appellants (defendants).

Thomas L. Sansonetti of Sheehan, Stevens & Sansonetti, Gillette, for appellee (plaintiff).

Before BROWN, C.J., THOMAS, CARDINE and MACY, JJ., and GUTHRIE, J., Retired.

CARDINE, Justice.

A jury found appellants liable for negligence and breach of an implied warranty of habitability after the house they built for appellee was condemned for structural defects. Appellants raise the following issues on appeal: (1) Whether the trial court erred in transferring the trial from Laramie County to Campbell County; (2) Whether the trial court improperly granted partial summary judgment for appellee on the issue of piercing the corporate veil when depositions and affidavits in support of appellee's motion for summary judgment were not filed with the motion or when the court heard the motion, and the hearing on the motion was held with less than ten days' notice to appellants; (3) Whether an affidavit filed by appellants created an issue of material fact precluding summary judgment; (4) Whether appellee was properly awarded damages for rental expenditures after his house became uninhabitable; and (5) Whether appellants were unfairly prejudiced by consolidation of their trial with a similar action concerning another home built by appellants.

We affirm in part and reverse in part.

## FACTS

In 1977 appellee Dale Slater bought a new home in a Gillette subdivision called Highland Estates. In the spring of 1983, he began to notice cracking problems in the walls and foundation of the house. By November 1984, the structural problems had become so serious that the natural gas lines to the home were disconnected and the house was condemned.

Appellee filed an action against appellants and several other defendants on theories of negligence and breach of an implied warranty of habitability. Appellant Atlas Construction Company, the builder of the home, is a wholly-owned subsidiary of appellant Atlas, Inc. Appellant Francis Ferguson and his family own all of the stock of Atlas, Inc.

A jury trial was held, and the jury found defendant Atlas Construction Company liable for the diminution in value of the house, the cost of demolition, and rental expenditures incurred by Mr. Slater when he found it necessary to rent another home. On the day the jury returned its verdict, the trial court entered an order granting partial summary judgment in favor of appellee on the issue of piercing the corporate veils of Atlas Construction Company and Atlas, Inc. The two corporations and Francis Ferguson were held jointly and severally liable for the judgment entered upon the jury's verdict.

## TRANSFER

Appellee originally filed this action in Campbell County. After the court entered summary judgment in favor of defendants City of Gillette and Campbell County, the remaining defendants obtained a change of venue to Laramie County. Appellee then moved the court to transfer the trial back to Campbell County pursuant to Rule 40.1(a)(1), W.R.C.P., on the grounds of convenience of witnesses, reduction of the costs of trial, and the need for a jury view of the home. The court concluded that Campbell County was "the most convenient forum for the trial" and granted appellee's motion. Appellants contend that the

court's ruling constitutes an abuse of discretion.

Rule 40.1, W.R.C.P., provides that upon motion of any party, the court "shall transfer the action to another county for trial if the court is satisfied that * * * the convenience of witnesses would be promoted thereby." The rule further provides that "[t]he presiding judge may at any time upon his own motion order a transfer of trial when it appears that the ends of justice would be promoted thereby."

Rule 40.1 obviously vests considerable discretion in the trial court. In defining judicial discretion, we have said that it is

"a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Martin v. State*, Wyo., 720 P.2d 894, 897 (1986).

We have also stated that

" '[a] court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did.' " *Id.* at 896 (quoting *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980)).

Appellants have failed to demonstrate an abuse of discretion. When the trial court ruled on appellee's motion for transfer, appellee's action had been consolidated with similar cases brought against appellants by three other plaintiffs. The consolidated plaintiffs anticipated that over twenty-five of their witnesses would be from Campbell County. They also contended that a jury view of the homes would be necessary. With these considerations in mind, the trial court concluded that in the interest of convenience, the trial should be held in Campbell County. This determination was based on objective criteria, was not arbitrary or capricious, and was well within the bounds of reason. Accordingly, it was not an abuse of discretion.

▪ Appellants next suggest that the trial court erred in granting appellee's transfer motion because it was not supported by sworn testimony. Rule 40.1 contains no requirement that the court may rely only upon sworn testimony in determining whether to transfer a trial. The court properly relied upon information contained in the jointly filed motion, witness lists on file, and arguments of counsel. We find no error in the transfer of the trial to Campbell County.

## SUMMARY JUDGMENT

### Procedural Sufficiency

▪ Appellants contend that the trial court erred in granting appellee's motion for partial summary judgment on the issue of piercing the corporate veil because the depositions relied upon by the court were not properly filed until after the court had signed the order granting partial summary judgment. Rule 56(c), W.R.C.P. provides:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions *on file*, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Emphasis supplied.)

Likewise, Rule 302(b) of the Uniform Rules for the District Courts of the State of Wyoming provides:

"At the time of filing a motion for summary judgment the movant shall designate *and file* relevant portions of the discovery documents relied upon." (Emphasis supplied.)

While the record reveals a lack of compliance with these requirements, it also reveals that the trial court had requested and received the depositions in question at a motion hearing on October 31, 1985, some eight months before entering the partial summary judgment order. The trial court explained the situation as follows:

"THE COURT: Gentlemen, I'll tell you something, when we heard the Motions originally in Douglas—and this may be the problem which I'm not going to get

this far enmeshed in again in handling a case long distance—I had the depositions. I thought the depositions were— Because in Douglas there is just a local rule, the guys ask to have the depositions filed and I allow them to be filed because I like the stuff to be in the record when I'm considering any kind of a Motion that has to do with depositions or any kind of discovery. Because we argued the Motion that day and used the depositions in the argument, and so on, I guess I assumed that they were a matter of record. Because the case was not in Douglas, then my gal sent them back to Gillette, I assumed, to be put in the file. But, you know, they weren't, because the Motion wasn't made. But I am going to admit them * * *."

It is clear in this instance that appellee's failure to file the depositions was merely a technical imperfection not affecting a substantial right of appellants. Appellants have failed to demonstrate that they were prejudiced by lack of notice, or for that matter, in any way. It has been said that

"[p]erfection is an aspiration, but the failure to achieve it in the judicial process, as elsewhere in life, does not, absent injury, require a repeat performance." *Miles v. M/V Mississippi Queen*, 753 F.2d 1349, 1352 (5th Cir.1985).

We find no reversible error in the procedure followed by the court in ruling on appellee's motion for summary judgment.[1]

*Substantive Sufficiency*

■ On the day the jury returned its verdict, the trial court entered partial summary judgment for appellee on the issue of piercing the corporate veil. Apparently the court had informed the parties before trial that it would grant partial summary judgment on that issue. No evidence was introduced on the piercing issue at trial; instead, the court relied upon depositions and affidavits. The court, relying upon *Amfac Mechanical Supply Co. v. Federer*, Wyo., 645 P.2d 73 (1982), concluded there was no genuine issue of material fact and pierced

the corporate veil. The ruling was erroneous. Partial summary judgment should not have been entered.

Initially, we note that the issue of piercing the corporate veil is not usually decided by summary judgment:

"It is recognized that the determination of whether there are sufficient grounds for piercing the corporate veil ordinarily should not be disposed of by summary judgment, in view of the complex economic questions often involved, especially if fraud is alleged, but summary judgment may be granted in a proper case where no genuine issue of fact is raised or shown." (Footnotes omitted.) 1 Fletcher Cyclopedia of the Law of Private Corporations § 41.95, p. 462 (C. Swearingen Ed. 1983).

Our review of the record and the court's order entering summary judgment convinces us that genuine issues of material fact existed.

In its order granting partial summary judgment, the court first stated that there was a unity of ownership among Atlas Construction Company, Atlas, Inc., and the other members of the "Atlas Group," with Francis Ferguson and his family owning all of the stock in Atlas Construction Company and Atlas, Inc. In addition, the court noted the existence of "interlocking directorates and offices" among the various Atlas entities. While the record supports these statements, and these facts are relevant to the piercing issue, they are not in themselves sufficient to support piercing the corporate veils of Atlas Construction Company and Atlas, Inc.

■ A corporation is recognized as a separate entity, distinct from the individuals comprising it, even though all of its stock is owned by a single individual. *Amfac Mechanical Supply Co. v. Federer*, supra 645 P.2d at 77. A parent corporation and its subsidiary

"are treated as separate and distinct legal persons even though the parent owns

---

1. In their statement of the issues, appellants assert that the hearing on appellee's summary judgment motion was held with less than ten days' notice to appellee. Because they have presented no argument on this assignment of error, we will not address it.

all the shares in the subsidiary and the two enterprises have identical directors and officers. Such control, after all, is no more than a normal consequence of controlling share ownership." (Footnote omitted.) H. Henn and J. Alexander, Laws of Corporations, § 148 (1983). See also, 1 Fletcher, supra, § 43.20, pp. 495–496.

Thus, while the facts of this case indicate unity of ownership and interlocking directorates, additional factors must be present in order to pierce the corporate veil.

The court's order continued with the following conclusion:

"The Defendants Atlas Construction Company, Atlas, Inc. and the rest of the Atlas Group failed to maintain an arms-length relationship in intercorporate transactions."

Neither appellee nor the court specified any undisputed facts to support this statement. To the contrary, the question of whether the corporations failed to conduct "arms-length transactions" was disputed by the affidavit of Fred Hansen, Atlas, Inc.'s controller, who stated:

"The books of Atlas, Inc., reveal that each of the corporations were treated separately and for work performed by one to another there were arms length transactions. For example, any intercorporate loan was evidenced by a note pursuant to which interest was charged at a rate tied into the prime of one of the local banks. Another example of intercorporate activities is that certain functions were performed by Atlas, Inc. on behalf of the various corporations and a management fee was charged to the various corporations based on the amount of work performed by Atlas, Inc. on behalf of the corporation. For example, checks were cut by Atlas, Inc. and charged off to the accounts of the various subsidiaries. Atlas, Inc. was paid for performing those services."

In light of these statements, and in the absence of any explanation of appellee's position on this question, we cannot say that appellee carried its burden of *clearly*

demonstrating the absence of a factual issue. *Weaver v. Blue Cross–Blue Shield of Wyoming*, Wyo., 609 P.2d 984, 987 (1980).

Next, the court concluded that

"[d]efendant Atlas Construction Company was undercapitalized at the outset and was later undercapitalized for the potential liabilities created by the amount and type of business in which it was engaged."

Undercapitalization is often cited as a factor which will support piercing the corporate veil. See *Amfac Mechanical Supply Co. v. Federer*, supra. The problem of determining adequate capitalization in a particular case, however, may be a complicated one.

"Courts cannot focus solely on initial corporate capital or assets, as some are prone to do, in deciding whether inadequacy of assets warrants a decision to pierce because subsequent changes, such as increased hazards or reduced assets, may render a determination as to initial inadequacy irrelevant.

\* \* \* \* \* \*

"Whatever the courts' requirements in terms of inadequacy of assets, courts must still consider many varying factors relevant to their deliberations. For example, where the inadequacy of capital and other assets is at issue the testimony of expert financial analysts and statisticians as to comparable businesses may be relevant. Perhaps this analysis might include evidence of the adequacy of insurance coverage, and involve testimony concerning the amounts of insurance carried by comparable businesses. Furthermore, in addition to consideration of the amount of capital provided, other factors such as shareholder loans and the amount of earnings retained by the corporation may be analyzed.

"Also, the courts must pay heed to the relevant time periods involved in the cases before them. Whether there was an inadequate level of assets since the inception of the corporation is of significance. However, the analysis cannot stop there. For example, if the corporation was started with an adequate level

of assets which thereafter became inadequate the court must then delve into the factors causing the decline. Obviously, a decline in the amount of assets due to purely business reasons could be viewed more sympathetically in a decision whether to pierce than would a situation where the defendant-shareholder bled the corporation of its assets. All of these factors and many more may play parts in a court's difficult task of measuring the adequacy of assets." (Footnotes omitted.) Gelb, Piercing the Corporate Veil—The Undercapitalization Factor, 59 Chicago–Kent L.Rev. 1, at pp. 4, 14–15 (1982).

In the present case, it was undisputed that Atlas Construction was initially capitalized with $832 paid by Francis Ferguson and his wife for stock shares. Fred Hansen's affidavit provides the following information on the capitalization of Atlas Construction company for the period from 1975 through 1985, which is the period of time when appellee dealt with the company:

| Year | Stock | Retained Earnings | Total Capitalization |
|------|-------|-------------------|----------------------|
| 6/30/75 | 40,873 | $284,039.00 | $324,912.00 |
| 6/30/76 | 40,873 | 296,665.00 | 337,538.00 |
| 6/30/77 | 40,873 | 314,341.00 | 355,214.00 |
| 6/30/78 | 40,873 | 340,725.00 | 381,598.00 |
| 6/30/79 | 40,873 | 559,278.00 | 600,151.00 |
| 3/31/80 | 40,873 | 602,857.00 | 643,730.00 |
| 3/31/81 | 40,873 | 614,316.00 | 655,189.00 |
| 3/31/82 | 40,873 | 599,258.00 | 640,131.00 |
| 3/31/83 | 40,873 | 566,997.00 | 606,870.00 |
| 3/31/84 | 40,873 | 547,919.00 | 588,792.00 |
| 3/31/85 | 40,873 | 298,494.00 | 339,367.00 |

Mr. Hansen's affidavit also discusses the circumstances surrounding the corporation's decline in assets:

"Since March of 1985 Atlas Construction Company has lost at least Three Hundred and Forty-three Thousand Eight Hundred and Fifty Dollars and Thirty-four Cents ($343,850.34). Those losses are set forth on the attached draft Income Statement attached hereto and incorporated herein by reference as Exhibit C. Basically there were two major events which caused the dissipation of the capitalization of Atlas Construction. First the selling off of some five houses which had been built by Atlas Construction resulted in a loss of One Hundred and Sixty-two Thousand Eight Hundred and Fifty Dollars and Thirty-five Cents ($162,850.35). That is largely attributable to the downturn in the real estate market. Additionally, the flood which occurred in August of 1985 destroyed plans and affected jobs to the extent of a loss of One Hundred and Twenty-four Thousand Five Hundred and Eleven Dollars and Forty-one Cents ($124,511.41). Details of the destruction caused by the flood are set forth in Exhibit D attached hereto * * *."

The record further suggests that Atlas Construction Company purchased insurance to cover the type of liability which arose in this case, but the company was apparently involved in a dispute with its carrier over coverage throughout the litigation and at the time when judgment was entered.

We can find no indication that these facts were taken into account by the trial court. The court had before it no evidence comparing the capitalization of Atlas Construction Company to similar corporations. Appellants provided evidence which tended to show that Atlas Construction Company's decline in assets was due solely to business reasons and was not the result of improper motives. We have said that summary judgment should not be granted when inquiry into facts is desirable to clarify the application of the law. *Weaver v. Blue Cross–Blue Shield of Wyoming*, supra 609 P.2d at 987. Considering the complexity of this issue, further inquiry into the facts is desirable.

The court next stated that Atlas Construction Company ceased to do business in 1985, but was never formally dissolved, that its assets were depleted and that appellants formed another corporation, Atlas Builders, to continue the same general purposes of Atlas Construction Company. Francis Ferguson gave the following deposition testimony concerning Atlas Builders:

"Q. (BY MR. KLUS) Is it in the plans of Atlas, Incorporated, I guess as the sole shareholder, to phase out Atlas Construction Company in some fashion?

"A. That's possible, although I don't—I'm not sure we need it anymore, if that's the right word, because we have a firm that's doing—if we have any speculative work, we have a firm that could do that. And our work now seems to be commercial, and we set up the Atlas Commercial to do that.

"Q. What is the other firm that you referred to that can do the residential work, if you have any that comes up?

"A. Atlas Builders.

"Q. Atlas Builders?

"A. Yes. And like I say, if we do any speculative, I think he described it this morning, the reason for the two is because of bonding capacity and such.

"Q. Atlas Builders, that's separate from Atlas Commercial?

"A. Correct.

"Q. And Atlas Builders, is it set up to handle both speculative and custom construction?

"A. Right now it isn't doing anything, but it could.

"Q. So it could do anything Atlas Construction Company could have done or can do right now?

"A. Yes.

* * * * * *

"Q. When Mr. Klus originally asked you about the number of corporations in the Atlas group you talked about how Atlas, Inc. holds the stock in three or four other ones. Later on you mentioned Atlas Builders. Is Atlas Builders part of the Atlas group?

"A. Same thing.

"Q. It also has its stock owned a hundred percent by Atlas, Inc.?

"A. Yes.

"Q. Do you know the incorporation date of Atlas Builders, even a year?

"A. If memory serves me right, we had a corporation ten years ago by the name of HFP, or something like that, and we simply used that old dormant corporation and changed the name, so to tell you when I don't remember.

"Q. Do you recall when the name change took place?

"A. I think sometime the first part of this year.

* * * * * *

"Q. Mr. Ferguson, you said that you were the president of Atlas, Inc., Atlas Commercial, Atlas Construction, Atlas Realty and Sun Ridge Homes. Are you also the President of Atlas Builders?

"A. Yes.

"Q. Why do you have Atlas Builders when you have already got Atlas Construction?

"A. Oh, there is a number of reasons. We were, you know, trying to get a clean break, if that's the right word, to see where we were at, and try to get started off without having a lawsuit hanging over your head and lenders would be loaning us money and, you know, all those kinds of things. And I believe there is some tax advantages, too, and that kind of stuff.

"Q. So would it be fair to say that Atlas Builders will probably do the same type of work that Atlas Construction used to do?

"A. If and when we ever decide to build anymore houses, they conceivably could."

While the evidence might support an inference that appellants liquidated Atlas Construction Company and formed Atlas Builders in order to evade existing obligations, it could also support an inference that appellants legitimately ceased residential construction and formed Atlas Builders to increase the possibility of obtaining financing for future commercial construction projects. The trial court obviously took the former view, concluding that Atlas Builders was formed "to get a 'clean break' from potential liabilities" and that "[t]here is evidence of a corporate scheme to concentrate assets in some corporations in the Atlas Group and liabilities in others."

 It appears that the trial court misperceived its role in reaching these conclusions. When ruling on a summary judgment motion, the only inferences which may be drawn are those favorable to the nonmoving party. *Weaver v. Blue Cross–*

*Blue Shield of Wyoming,* supra 609 P.2d at 987. Moreover, the nonmoving party should receive the benefit of *any* doubt concerning the propriety of granting summary judgment. *Id.*

We conclude that the trial court erred in granting partial summary judgment, as appellee failed to demonstrate the absence of any genuine issue of material fact, and we will remand for trial on the piercing issue.

■ Our disposition of this case raises the question of whether the parties are entitled to a jury trial on the piercing issue. We have held that the doctrine of piercing the corporate veil is an equitable one which is " 'particularly within the province of the trial court.' " *State ex rel. Christensen v. Nugget Coal Company,* 60 Wyo. 51, 144 P.2d 944, 952 (1944) (quoting *Stark v. Coker,* 20 Cal.2d 839, 129 P.2d 390 (1942)). "Whether a corporate structure should be disregarded is peculiarly a question for courts to determine from evidence." *Southern Electrical Supply Co. v. Raleigh County National Bank,* W.Va., 320 S.E.2d 515, 525 (1984). See also, *McCain Foods, Inc. v. St. Pierre,* Maine, 463 A.2d 785, 787 (1983). We conclude that there exists no right to a jury trial on the issue of piercing the corporate veil.

## DAMAGES

■ In addition to damages for diminution in value of the house and the cost of demolition, the jury awarded appellee $6,506.00 for rental payments he made on another home after his home became uninhabitable. Appellants contend that appellee was not entitled to the rental payments. We disagree.

■ The proper measure of damages for permanent injury to real property is the difference between the value of the property immediately before the injury and its value after the injury. *North Central Gas Company v. Bloem,* Wyo., 376 P.2d 382, 385 (1962). The primary objective in determining damages in such cases, however, is to determine the amount of the loss, and no hard and fast rule can be laid down for all cases. *Id.* In tort cases, the measure of damages is the amount which will compensate a claimant for *all* the detriment proximately caused by the tort-feasors's breach of duty. *Hagar v. Mobley,* Wyo., 638 P.2d 127, 139 (1981). The rental expenditures incurred by appellee between the time he was forced to leave his home and the time that he purchased another home were a direct consequence of appellants' negligence. Appellee rented the home for approximately eight months, which was not an unreasonable length of time under the circumstances. We hold that appellee was entitled to be compensated for rental expenditures.

## CONSOLIDATION

■ When the trial in this case began, it had been consolidated with the trials of three similar cases brought by other homeowners in the Highland Estates subdivision. Apparently, all four cases were to be tried before the same jury. Appellee was the first plaintiff to present his case. When his presentation had been completed, the court gave the following instruction to the jury:

"And now we will be putting on another case with another Plaintiff, the same Defendant. However, you will have to separate in your minds the cases as they come to you. So you will be hearing another Plaintiff and another opening and another house involved and you will have to separate that entirely from the case you have been hearing the last few days.

\* \* \* \* \* \*

"I want you to understand that today you will be hearing about another matter, so don't associate that with the Slater case which you have already heard until you hear Mr. Buck in his Defense. "Then I want to caution you again not to make up your minds in any of the cases until the entire matter has been submitted to you and until Mr. Buck has had a chance to put on his Defense and until all of the cases have been heard. Then you will have a chance to deliberate and make up your minds and come to a decision."

Following this instruction, the plaintiffs in one of the other cases began to present their case.

The next morning appellants moved the court to "deconsolidate" the cases, contending that the jury would confuse the evidence and unfair prejudice would arise. The court granted appellants' motion and instructed the jury as follows:

> "Ladies and gentlemen of the Jury, before calling you in this morning, we met with counsel—counsel and the Court met and we made some decision relative to how we are going to proceed with this case. In order to save you time and perhaps a long trial where you would have to sit here for two or three weeks, we decided to divide this up a little differently.
>
> "In that respect, Mr. Buck, who represents the Defendants here, will put on his Defense now in the first case, which is the matter of the Slater house. We felt that doing it this way would enable the Jury to separate these cases better in their minds rather than having all the Plaintiffs put on their case and then the Defense. So Mr. Buck will begin the Defense of the Slater case in the morning.
>
> "Then we should be able to wrap up that case this week. We will then make a decision as to how to proceed with the other cases. However, it may not be immediately and that will give the Jury— and we will relieve the Jury of having to sit here for two or three weeks.
>
> \* \* \* \* \* \*
>
> "Counsel reminded me of one more thing that I wanted to tell the Jury this morning, and that is because Friday of last week the Plaintiff—Mr. Klus started his case in the matter of Hayzlett, I am going to ask the Jury to disregard that testimony entirely for now and just concentrate on the Slater case until that is submitted to you for your decision."

Appellants now contend that the consolidation of the trials was reversible error. They have failed, however, to articulate any demonstrative prejudice in this regard, and we have found none. The trial court separated the trials, at the request of appellants' counsel, to *prevent* any possible prejudice. The jury was thoroughly instructed to consider only the evidence presented in appellee's trial in rendering its verdict. The special verdict contained very specific findings relating to the defects in the Slater residence and their causes. We conclude that the court did not abuse its discretion by consolidating and then separating the cases for trial.

Affirmed in part, reversed in part, and remanded for trial for the limited purpose of determining the issue of piercing the corporate veil.