**IN THE COURT OF APPEALS OF IOWA**

No. 14-1404
Filed November 12, 2015

**MINGER CONSTRUCTION, INC.,**
        Plaintiff-Appellee,

**vs.**

**CLARK FARMS, LTD., and KEVIN
W. CLARK, aka K.W. "CASEY" CLARK,**
        Defendants-Appellants.
_____

        Appeal from the Iowa District Court for Dickinson County, David A. Lester,

Judge.


        A subcontractor on a city's sewer upgrade project and the sole

shareholder of the subcontracting company appeal a jury verdict in favor of the

contractor.  **AFFIRMED.**


        Andrea M. Smook of Cornwall, Avery, Bjornstad, Scott & Davis, Spencer,

for appellants.

        Wade S. Davis of Stinson, Lenard & Street, L.L.P., Mankato, Minnesota,

for appellee.


        Considered by Vaitheswaran, P.J., and Tabor and McDonald, JJ.

**VAITHESWARAN, Presiding Judge.**

A subcontractor on a city's sewer upgrade project and the sole shareholder of the subcontracting company appeal a jury verdict in favor of the contractor. They assert the evidence was insufficient to support (1) a finding that the subcontractor breached its contract and (2) a finding that the shareholder was personally liable for damages.

I. BACKGROUND FACTS AND PROCEEDINGS

Minger Construction, Inc. contracted with the City of Terril to upgrade its sewer system. Minger subcontracted with Clarks Farms, Ltd. to remove processed human and food grade waste, known as sludge. The subcontract agreement required Clark Farms "to furnish all labor, material, skill and equipment necessary or required and to perform all the work . . . necessary to complete" the project.

Kevin Clark was "the sole owner, the shareholder, the sole board member and the president" of Clark Farms. Clark Farms failed to comply with certain prerequisites to working on the public project. The company was incorporated in 2001 but was administratively dissolved in 2012, the year Clark Farms entered into the contract with Minger. The company did not have its corporate status reinstated until 2013. The company also failed to maintain a certified payroll and observe specified safety practices. Minger notified Clark of these omissions and, on multiple occasions, attempted to obtain compliance. Clark Farms did not respond.

Clark Farms began removing sludge, but ran into problems, including equipment failure. On September 25, 2012, Minger transmitted a notice to Kevin

Clark stating, "If you are not on the above-referenced project by tomorrow morning 09-26-12 @ 7:00 AM—we will proceed to hire someone else and your equipment will be held in escrow for reimbursement of added costs because you are in breach of your contract." Clark Farm employees went to the job site but, according to Minger, did not perform their job duties.

Ten days after the September 25 notification, Minger terminated the contract for failure to "satisfactorily meet[] the terms of the Default Notice." Minger hired a new company to complete the sludge removal and sued Clark Farms and Clark for breach of the subcontract.

The case proceeded to a jury trial. The jury found Minger did what it was required to do under the contract, Clark Farms breached its contract with Minger, and Kevin Clark was personally liable for the breach. The jury awarded Minger damages of $78,272.36. Clark Farms and Clark appealed.

## II. Analysis

### A. Breach of Contract

The jury was instructed Minger would have to prove the following elements of its breach-of-contract claim:

> (1) the existence of a contract, (2) the terms of the contract, (3) [Minger] had done what the contract requires, (4) [Clark Farms and Clark] breached the contract, and (5) the amount of any damage [Clark Farms' and Clark's] breach caused [Minger].

The defendants take issue with the jury's findings on the third and fifth elements. Our review of the fact findings is for substantial evidence. *See Iowa Mortg. Ctr., L.L.C. v. Baccam,* 841 N.W.2d 107, 110 (Iowa 2013).

### 1. Element 3

Clark Farms and Clark contend Minger did not do what the contract required, as specified in the third element of the instruction and, specifically failed to follow the default provision of the contract. The provision states:

> 17. (Default) That in case the Subcontractor shall fail when and if required by the Contractor, to correct, replace and/or re-execute faulty or defective work done and/or materials furnished under this Subcontract, or repeatedly and persistently to complete or proceed with this Subcontract within the schedule agreed to by the parties or the time herein provided for, . . . or to comply with any substantial term of this Subcontract, then the Contractor may give the Subcontractor a written notice to cure the Subcontractor's default. If the Subcontractor fails within three (3) working days after receipt of the notice of default to commence and continue satisfactory correction of such default with diligence and promptness, then the Subcontractor shall be in default of this Subcontract and the Contractor, upon an additional three (3) calendar days notice in writing to the Subcontractor, shall have the right to terminate this Subcontract and finish the Subcontractor's Work, replace and/or re-execute such faulty or defective Work or materials, either through its own employees or through a contractor or subcontractor of its choice, and to charge the cost thereof to the Subcontractor, together with any liquidated or actual damages caused by a delay in the performance of this Subcontract.

The defendants concede Minger's September 25 notice "would be seen as the notice of default required under Paragraph 17." They argue Clark Farms "show[ed] up on site and started working" as required by the default notice, "thus curing their default within three working days." In light of their actions, they assert Minger "was required to give [them] an additional three day[] notice before termination of the contract."

A reasonable juror could have found otherwise. Patrick Minger testified simply being at the job site was not enough; "[c]ommon sense" would dictate the employees also had to be "producing." Minger said "they weren't producing."

The jurors could have credited his testimony over Clark's, who said he "had guys over there working on the transfer of the material." *See Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 394 (Iowa 2010) (stating the fact finder determines witness credibility and the weight of the evidence). The jury could have surmised Clark Farms's failure to perform productive work was essentially the straw that broke the camel's back.

Patrick Minger stated the engineering company on the project was giving him "heat" to get the sludge cleared. Clark Farms did not accomplish this goal and, in addition, failed to obtain the proper contractor certification, failed to pay for the repair of its equipment, failed to pay its employees statutorily required wages, failed to train its employees, failed to take proper safety precautions, failed to perform the work in an "orderly and efficient manner," and failed to use the "means and methods necessary to accomplish the job." In light of these numerous omissions, the jury could have found the defendants did not cure the default on the day after the default notice was issued and, under the contract, Minger could terminate the agreement in another three days. Minger waited nine days before terminating the contract.

Clark Farms and Clark also contend Minger failed to timely notify them of claims Minger had against Clark Farms, as required by another provision of the contract. Again, the jury reasonably could have found from Patrick Minger's testimony that Minger provided this notification as soon as it was able to determine the amount of its claims.

We conclude there was substantial evidence to support the third element of the breach-of-contract claim.

### 2. Element 5

Clark Farms next contends Minger failed to prove the amount, if any, of damages. The jury was instructed:

> The measure of damages for breach of a contract is an amount that would place [Minger] in as good a position as it would have enjoyed if the contract had been performed by [Clark Farms and Clark.] The damages you award must be foreseeable or have been reasonably foreseen at the time the parties entered into the contract.

The instruction went on to specify certain types of damages the jury could consider.

As noted, the jury awarded $78,272.36. The award was supported by substantial evidence in the form of Patrick Minger's testimony that he was forced to hire a replacement company to complete the sludge removal and the company incurred costs for equipment rental. The amount the jury awarded was less than Minger requested.

### B. Clark's Personal Liability

Kevin Clark contends there was insufficient evidence to support the imposition of personal liability on him. The pertinent jury instruction stated:

> Under Iowa law, a shareholder can be personally liable for the obligations of his or her corporation in certain circumstances. [Minger] claims that . . . Kevin W. Clark must be held legally responsible for the acts of Defendant Clark Farms, Ltd.
>
> To establish this claim, Plaintiff must prove all of the following propositions:
>
> 1. Defendant Kevin W. Clark is a shareholder of Clark Farms, Ltd.
> 2. Defendant Clark Farms, Ltd., is liable to Plaintiff.
> 3. Defendant Kevin W. Clark has abused the corporate privilege.

4.　　The amount owed by Defendant Clark Farms, Ltd. to Plaintiff.

The instructions went on to define "corporate privilege" as "the right of a shareholder of a corporation to avoid personal liability for the financial obligations of the corporation."  The instructions set forth factors the jury could consider in deciding whether an abuse of the corporate privilege was established, including undercapitalization, the failure to maintain separate books, and failure to follow corporate formalities.  *See Boyd v. Boyd & Boyd, Inc.*, 386 N.W.2d 540, 544 (Iowa Ct. App. 1986).  Our review of the jury's finding of personal liability is for substantial evidence.  *C. Mac Chambers Co., Inc. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 596 (Iowa 1987).

A reasonable juror could have found the existence of these factors.  As noted, Kevin Clark allowed the corporate registration to lapse. Clark admitted he made $530,000 in loans to the company to "keep the company funded."  Clark also agreed he lost $837,264 over the life of the company.   Substantial evidence supported the jury's imposition of personal liability on Kevin Clark.

We affirm the jury's findings and the judgment in favor of Minger.

**AFFIRMED.**

Tabor, J., concurs; McDonald, J., concurs in part and dissents in part.

**MCDONALD, Judge.** (concurring in part and dissenting in part)

This is a simple breach of contract case, and the jury's verdict is supported by substantial evidence on that claim. This case is not one of the exceptional circumstances in which liability should be imposed on a shareholder for what is otherwise a corporate obligation. I thus concur in part and dissent in part.

It has been long accepted a corporation is a legal entity with jural existence separate and distinct from its shareholders. *See* Iowa Code § 4.1(20) (defining a person to include a corporation); *Wyatt v. Crimmins*, 277 N.W.2d 615, 616 (Iowa 1979).. It has been long accepted a corporation's shareholders are not personally liable for the obligations of the corporation solely because of their status as shareholders. *See* Iowa Code § 490.622(2) ("Unless otherwise provided in the articles of incorporation, a shareholder of a corporation is not personally liable for the acts or debts of the corporation."); 5 Matthew Doré, *Iowa Practice Series*: *Business Organizations* § 15.3(1), at 454 (2014-2015) (stating limited liability is the presumptive rule.). It also has been long accepted courts will disregard the presumptive rule of limited liability under exceptional circumstances and impose liability on an individual or individuals for what would otherwise be a corporate obligation. *See Wade & Wade v. Cent. Broad. Co.*, 288 N.W. 441, 443 (Iowa 1939).

While the rule allowing for the imposition of personal liability on a shareholder for a corporate obligation is long accepted, the rationale underlying the rule is not well developed. *See* 5 Doré, *Iowa Practice* § 15:3, at 458 ("In Iowa, as elsewhere, it is difficult to make sense of the case law governing

disregard of the corporate entity."); Mark A. Olthoff, *Beyond the Form—Should the Corporate Veil be Pierced?*, 64 UMKC L. Rev. 311, 312 (1995) ("Courts and commentators have struggled for many years to develop principles that, when applied, would reveal whether a separately existing corporate organization should be disregarded."); Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 Cornell L. Rev. 1036, 1036 (1991) ("Piercing the corporate veil is the most litigated issue in corporate law and yet it remains among the least understood."). Our cases speak only in metaphor and generalities, holding the "corporate veil can be pierced" when the corporation is a "mere shell," "sham," "intermediary," "instrumentality," or "alter ego" of the shareholders. "This language is inherently unsatisfactory since it merely states the conclusion and gives no guide to the considerations that lead a court to decide that a particular case should be considered an exception to the general principle of nonliability." Robert W. Hamilton, *The Corporate Entity*, 49 Tex. L. Rev. 979, 979 (1971). Ultimately, the issue "is one that is still enveloped in the mists of metaphor." *Berkey v. Third Ave. Ry. Co.*, 155 N.E. 58, 61 (N.Y. 1926).

The metaphor of piercing the corporate veil has incorrectly framed the relevant question. *See id.* ("Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it."). Our cases treat the question of "veil piercing" as if it were a cause of action proved by evidence of one or more of the following:

> 1) the corporation is undercapitalized, (2) the corporation lacks separate books, (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or

illegality, (5) corporate formalities are not followed, or (6) the corporation is a mere sham.

*See C. Mac Chambers Co., Inc. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 598 (Iowa 1987). The metaphor does not capture the truth or spirit of the matter. In a veil piercing case, the "corporate veil" is not actually pierced and the corporate entity is not disregarded; instead, judgment is entered against the corporation, as the judgment entry in this case reflects, and the district court takes the additional step of imposing judgment against a shareholder for the corporation's liability where liability otherwise would not exist. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004) ("Piercing the corporate veil, after all, is not itself an action; it is merely a procedural means of allowing liability on a substantive claim."). As one commentator noted:

> In no area is the misleading character of the entity metaphor more evident than in that of shareholder liability for corporate debts. Much of the language of the cases dealing with shareholder liability starts with the proposition that the existence of the corporate entity requires the denial of such liability, and therefore any case which imposes such liability can only do so by disregarding the corporate entity. Instead of dealing with the proper question of when, if ever, shareholders will be liable for corporate obligations, decisions are made in terms of the question of whether the corporate entity exists or is to be disregarded.

William P. Hackney & Tracy G. Benson, *Shareholder Liability for Inadequate Capital*, 43 U. Pitt. L. Rev. 837, 843 (1982). Framing the question around the existence of the entity rather than the imposition of liability as an equitable remedy has hindered development of the law in this area in several respects, one of which deserves further consideration here. Specifically, framing the question around the existence of the entity rather than the equitable and remedial nature

of the rule has precluded discussion of whether the issue should be decided by the jury at law or the district court in equity.

There is no doubt the district court was required to submit the veil-piercing inquiry to the jury in this case; our cases hold veil piercing is a question of fact for the jury. *See Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 923 (Iowa 1978) ("We mention briefly Team Central's additional argument that whether or not the corporate veil should be pierced is a question of law to be decided by the court, not the jury. We do not believe that this is a correct statement and several of our cases hold otherwise."); *Spectrum Prosthetics & Orthotics, Inc. v. Baca Corp.*, No. 08-0811, 2009 WL 3337600, at *4 (Iowa Ct. App. Oct. 7, 2009) (holding jury instruction was required where there was sufficient evidence to support at least one *Briggs* Factor). Our cases, however, have not addressed the rationale for submitting the question to the jury. Upon examination, the rationale for the rule and practical considerations support the conclusion that the question should be one reserved for the court subject to de novo review and not a question of fact for the jury subject to correction for legal error.

The decision to impose liability on a shareholder for corporate obligations where there is no basis for liability at law, *see* Iowa Code § 490.622(2), is necessarily an equitable remedy within the province of the district court and not the jury. *See Benson v. Richardson*, 537 N.W.2d 748, 762 (Iowa 1995) (stating "[w]here equity requires us to examine the purposes of a corporation, we are not bound by forms, fiction, or technical rules"); *Wescott & Winks Hatcheries v. F. M. Stamper Co.*, 85 N.W.2d 603, 607 (Iowa 1957) (stating disregard of the corporate entity is "an equitable prerogative to circumvent its improper use"); *Boyd v. Boyd*

*& Boyd, Inc.*, 386 N.W.2d 540, 543-44 (Iowa Ct. App. 1986) (noting the equitable nature of the remedy); 5 Doré, *Iowa Practice* § 15:4, at 467 ("[P]iercing analysis is equitable in nature.").

Reserving this question for the district court does not infringe the right to trial by jury. "[T]he right to a jury trial preserved by the Iowa Constitution, article I, section 9, is the right that existed at common law." *Iowa Nat'l Mut. Ins. Co. v. Mitchell*, 305 N.W.2d 724, 728 (Iowa 1981). The common law distinguished between actions arising at law tried to a jury and actions arising in equity tried to the court and without a jury. *See id.* at 727; *see also Katchen v. Landy*, 382 U.S. 323, 337 (1966) (stating that "the right of trial by jury, considered as an absolute right, does not extend to cases of equity jurisdiction"). This distinction between actions arising at law and actions arising in equity survived the procedural unification of courts of law and courts of equity. The imposition of personal liability for a corporate obligation is not a common law claim requiring trial by jury. *See Int'l Fin. Servs. Corp.*, 356 F.3d at 737 (discussing Illinois Law and stating veil piercing is an equitable remedy to be decided by the court); *Nelson v. Brunswick Corp.*, 503 F.2d 376, 381 n.10 (9th Cir. 1974) ("The question of whether to disregard a corporate entity under Washington law is one for the court to decide."); *Dow Jones Co. v. Avenel*, 198 Cal. Rptr. 457, 460 (Cal. Ct. App. 1984) (stating the question "is essentially an equitable one and for that reason is particularly within the province of the trial court" and the "constitutional guaranty of the right to a jury trial does not apply to actions involving the application of equitable doctrines and the granting of relief that is obtainable only in courts of equity"); *Chin v. Roussel*, 456 So. 2d 673, 678 (La. Ct. App. 1984) ("Whether the

corporate veil should be pierced is primarily a finding of fact best made by the trial judge."); *Atlas Constr. Co. v. Slater*, 746 P.2d 352, 359 (Wyo. 1987) ("Whether a corporate structure should be disregarded is peculiarly a question for courts to determine from evidence. We conclude that there exists no right to a jury trial on the issue of piercing the corporate veil.")

There are sound practical reasons for having the district court resolve the issue rather than a jury. The issue of corporate governance is complicated. *See, e.g.*, *Weltzin v. Nail*, 618 N.W.2d 293, 301 (Iowa 2000) (concluding in a corporate derivative suit a "judge is simply better equipped to hear the complicated corporation and duty claims" than a jury). For example, in this case, the jury was asked to decide if corporate formalities were followed. However, Minger Construction offered no testimony and the district court gave no instruction on the corporate formalities required for a closely held corporation electing S-corporation tax treatment. Judges are familiar with the legal requirements based on training and experience and can better address the issue. Our supreme court has thus concluded that some equitable questions regarding corporate governance should be presented to the district court in equity rather than to a jury at law:

> Much has been written about the necessity of having equitable cases heard by a judge. Disregarding the traditions which underlie the jury as an institution, the use of twelve individuals drawn at random with diverse education, intellectual ability, and occupations, but lacking the specialized knowledge and ability to evaluate testimony, is clearly not an ideal system for determining facts in litigation. No matter how kindly one views the jury there is no question that at times its verdict represents fiction and not fact. Our jurisprudence has never provided an absolute right to a jury trial in every case.

*Id.* at 302.

It is also exceedingly difficult to craft instructions that provide meaningful guidance to the jury. *See id.* (identifying "juror competence as one of the considerations to be used when determining if a jury is warranted"). Here, the district court submitted the "veil piercing" question to the jury. The jury instructions set forth relevant factors but provided little guidance on how the factors were to be reconciled. Is the evidence sufficient to pierce the corporate veil if the plaintiff proves only one of the six factors? It is unclear. *Compare HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 936 (8th Cir. 2007) ("A party seeking to pierce the corporate veil need not prove all six factors, but it must prove at least one of the factors."); *and Fazio v. Brotman*, 371 N.W.2d 842, 846 (Iowa Ct. App. 1985) ("The instruction tells the jury they can pierce the corporate veil only when there are exceptional circumstances and when any one of the six items is established. This accurately sets out Iowa law in this area."); *with Ross v. Playle*, 505 N.W.2d 515, 517-18 (Iowa Ct. App. 1993) (holding the failure to follow corporate formalities, standing alone, was not sufficient ground to pierce the corporate veil). What about other factors not addressed by the six factor test? For example, one court considers at least nineteen factors, plus any other evidence that might be relevant in a totality of the circumstances test. *See Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 98-99 (W. Va. 1986). In *Boyd*, the court recognized the six factors usually identified as being relevant are not exclusive and that the test is simply ad hoc:

> Where Gene's argument fails is in his characterization of these factors as the only factors which warrant "piercing the corporate veil." Nowhere in Lakota is its listing claimed to be an exclusive or

even an exhaustive one. Rather, no precise formula is available to predict when a court should disregard the corporate entity as Fletcher explains after a more extensive listing of factors than Lakota's: The conclusion to disregard the corporate entity may not, however, rest on a single factor but often involves a consideration of the mentioned factors; in addition, the particular situation must generally present an element of injustice or fundamental unfairness . . . . It seems clear that no hard and fast rule as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case and that factors adopted as significant in a decision to disregard the corporate entity should be treated as guidelines and not as a conclusive test. *Fletcher*, § 41.30 at 430-31. Additionally, at least two other noted treatises on corporate law state that one of the circumstances which may move a court to disregard corporate entity is where limited liability would be inequitable. 6 Hayes, *Iowa Practice Business Organizations* § 882 at 298 (1985); Hornstein, *Corporation Law and Practice* § 752 at 265 (1959). Hayes further specifies that "[t]he corporate veil may be disregarded when recognition would work inequitably against one or more groups of creditors of the enterprise . . . ." Hayes, § 886 at 308.

386 N.W.2d at 543-44. The jury cannot be given meaningful instruction when the case law provides there is no "hard and fast rule" to resolve the issue.

In sum, the gestalt inquiry makes the question particularly ill-suited for jury determination:

The substantive law of veil-piercing, therefore, necessitates the analysis of a variety of factors and the weighing or balancing of a combination of those factors that are present. However, when a jury is to be instructed on the basis of ultimate facts, rather than evidentiary facts, a proper jury instruction becomes very difficult to draft. If a jury is to consider the evidence in light of various factors indicating "control," *all or some* of which may be determinative, the final decision is left to the wandering vicissitudes and suppositions of the jury. Thus, an instruction on the issue of piercing the corporate veil can create a "roving commission." Such a "roving commission" instruction is inherently prejudicial and may be presumptively erroneous. Because it may be difficult to submit a proper instruction on veil-piercing to the jury, the trial judge should review and examine the evidence, and, ultimately, reach a conclusion on whether to disregard the corporate veil. The trial judge is also uniquely situated to make the veil-piercing determination. The judge is trained in the law and is more apt to

consider all of the evidence presented by all of the parties. The court is less likely to be swayed by emotion or adept argument, particularly in highly publicized or devastating tort cases. Further, a separate hearing of the piercing issue, away from the jury, may prevent potentially prejudicial (and otherwise irrelevant) financial information from being revealed to the jury. Finally, the trial judge is more likely to be familiar with the facts of the case and, more generally, the body of law involving disregard of corporations, particularly the concepts of "control" and "improper use." Each of these reasons weighs in favor of the trial judge deciding the veil-piercing question.

Olthoff, 64 UMKC L. Rev. at 335-36.

For the above-stated reasons, I would be in favor of reserving the liability question for the court in equity subject to de novo review. Controlling case law, however, dictates our review is for the correction of legal error on substantial evidence review. The standard of review is not dispositive of the claim in this case, however. Substantial evidence review "does not preclude inquiry into the question whether, conceding the truth of the facts found, a conclusion of law drawn therefrom is correct, nor are we bound by the trial court's determination of the law." *Briggs Transp. Co., Inc. v. Starr Sales Co.*, 262 N.W.2d 805, 811 (Iowa 1978). Even when the evidence is viewed in the light most favorable to the plaintiff, there is not substantial evidence in support of the verdict. Indeed, there is no evidence in support of the verdict.

I begin with the proposition that a court will impose personal liability on a shareholder for the corporation's obligations only in the most exceptional of circumstances. *See C. Mac Chambers Co., Inc.*, 412 N.W.2d at 597. "Plaintiffs bear the burden of proving that exceptional circumstances exist which warrant piercing the corporate veil." *Id.* at 598. And the burden is significant. *See HOK Sport, Inc.*, 495 F.3d at 935 ("Disregarding the entity's corporate form under

either the alter ego doctrine or the remedy of piercing the corporate veil is an extraordinary measure that should be reserved for exceptional circumstances, . . . and the party seeking to do so bears the burden of proof."); *Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983) ("Holding a shareholder in a corporation individually liable for a corporate debt is an extraordinary procedure and should be done only when the strict requirements for imposing individual liability are met."); *White v. Winchester Land Dev. Corp.*, 584 S.W.2d 56, 62 (Ky. Ct. App. 1979) ("Generally speaking, the corporate veil should only be pierced reluctantly and cautiously. . . ."); *see also Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task."); *TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749, 751 (N.Y. 1998) (stating that "[t]hose seeking to pierce a corporate veil . . . bear a heavy burden"). This is a heavy burden. The majority makes no effort to explain why the burden has been met in this case. Instead, the majority summarily dismisses Clark's argument by rattling off three facts immaterial to the question.

There is no evidence supporting a finding Clark Farms was undercapitalized. *See Briggs Transp. Co.*, *Inc.*, 262 N.W.2d at 810 (identifying undercapitalization as a relevant factor). The relevant inquiry is the capital structure of the entity at or near the time of incorporation. *See Gilleard v. Nelson*, No. 03-1496, 2005 WL 2756042, at *3 (Iowa Ct. App. Oct. 26, 2005) (affirming imposition of liability on individual where entity "was undercapitalized at its moment of incorporation"); *Midwest Fuels, Inc. v. JP & K, Inc.*, No. 03-0218, 2004 WL 358291, at *2 n.1 (Iowa Ct. App. Feb. 27, 2004) (recognizing the relevant

inquiry is "initial capitalization of the corporation); *see also Pierson v. Jones*, 625 P.2d 1085, 1087 (Idaho 1981) ("However, financial inadequacy is measured by the nature and magnitude of the corporate undertaking or the reasonableness of the cushion for creditors at the time of its inception of the corporation."); *Global Credit Servs., Inc. v. AMISUB (Saint Joseph Hosp.), Inc.*, 508 N.W.2d 836, 839 (Neb. 1993) ("Inadequate capitalization means capitalization very small in relation to the nature of the business of the corporation and the risks the business entails measured at the time of formation."). "Clearly, a corporation adequately capitalized at its inception can become undercapitalized at a later time for any of a variety of legitimate reasons." *Pierson*, 625 P.2d at 1087.

The majority does not identify a single piece of evidence regarding the capital structure of Clark Farms at or near the time of incorporation. Clark Farms was incorporated in 2001. The only evidence regarding the corporation's finances is a 2012 federal tax return, which reflects the company's tax information eleven years after the relevant date. The exhibit does not provide any evidence regarding Clark Farms' capital structure at or near the time of incorporation. At best, the tax return shows only the company reported negative retained earnings. That fact does not allow for any inference regarding Clark Farms' capital structure at or near the time of incorporation. The jury was never provided information regarding when the loss was sustained and why. Likewise, the majority's reliance on the fact Clark loaned his company money is misplaced. There is no evidence of when the loan was made. Further, preferring debt capital over equity capital is not improper. In short, Minger Construction failed to

introduce any evidence regarding the capital structure of the corporation at or near the time of incorporation.

The majority's analysis regarding undercapitalization is woefully inadequate for another reason. Undercapitalization is a relational concept. The relevant question is not whether the corporation had a specific amount of capital at or near the time of incorporation but whether the capital structure was adequate as measured by the nature and magnitude of the corporate undertaking. *See J-R Grain Co. v. FAC, Inc.*, 627 F.2d 129, 135 (8th Cir. 1980) ("Adequate initial financing should not be confused with formal minimum paid-in capital requirements applicable in several jurisdictions."); *Briggs Transp. Co., Inc.*, 262 N.W.2d at 810 ("If capital is illusory or trifling *compared with the business to be done and the risks of loss*, this is a ground for denying the separate entity privilege." (emphasis added)). Minger Construction failed to introduce evidence of the amount of capital needed given the nature and magnitude of the business undertaking. *See J-R Grain Co.*, 627 F.2d at 135 ("Inadequate capitalization . . . means capitalization very small in relation to the nature of the business of the corporation and the risks the business necessarily entails. Inadequate capitalization is measured at the time of formation of the corporation. A corporation that was adequately capitalized when formed but has suffered losses is not undercapitalized."); Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. Chi. L. Rev. 89, 113 (1985) ("By 'adequately' capitalized we mean an amount of equity that is within the ordinary range for the business in question. Both the absolute level of equity investment and the debt-equity ratio will depend on the kind of business on which

the firm is embarked."). No expert witness or any other witness testified regarding the capital requirements necessary to engage in this kind of business.

> For example, comparison with the capitalization of other corporations in the same or a similar line of business may be made. The capitalization of the corporation in question could be compared with the average industry-wide ratios (current ratio, acid-test ratio, debt/equity ratio, etc.) obtained from published sources . . . . These average ratios could be buttressed by expert testimony from certified public accountants, securities analysts, investment counselors or other qualified financial analysts.

*Laya*, 352 S.E.2d at 101. On the record before us, there is simply no evidence from which it could be inferred Clark Farms did not have capital to engage in the business of dredging and the land application of biosolids.

The only reasonable inference to be drawn from this record is Clark Farms was adequately capitalized given the nature of the business. At the time of trial, Clark Farms had been in business for over twelve years. *See Cass v. Sands*, No. 05-1008, 2006 WL 229033, at *4 (Iowa Ct. App. Feb. 1, 2006) (holding the plaintiff failed to create a disputed issue of fact regarding capitalization where evidence showed the business had sufficient capital to operate for one year). By all indications, it was a going concern with assets, including an office and equipment, employees, and business. At best, the evidence showed Clark Farms may have had negative earnings for one or more years, but that fact is largely immaterial. *See Midwest Fuels, Inc.*, 2004 WL 358291, at *2 (holding the plaintiff failed to create a triable issue of fact where the corporation had capital at inception and was in business for a "period of time [but] the business was not successful"). In sum, Clark Farms was a legitimate business in continuous operation for more than a decade.

The majority concludes the jury's verdict is supported by substantial evidence because Clark Farms failed to maintain separate financial records. *See Briggs Transp. Co., Inc.*, 262 N.W.2d at 810 (identifying the maintenance of separate books as a relevant factor). I do not find any evidence, let alone substantial evidence in support of this factor. It is not disputed Clark and Clark Farms maintained separate financial records. Clark testified the corporation kept separate books and finances. Halverson, the officer manager, testified the corporation kept separate books and finances. The 2012 tax return shows Clark Farms filed a tax return separate from Clark. The payroll records admitted into evidence show Clark Farms and not Clark paid the company's employees. When Clark loaned the corporation funds, the funds were documented in the relevant financial records.

The majority also concludes Clark Farms failed to follow corporate formalities because it let its "corporate registration" lapse. *See id.* (identifying the failure to follow corporate formalities as a relevant factor). It is unclear what that means. In any event, there is no evidence, let alone substantial evidence in support of this factor. First, there was no evidence or instruction provided to the jury regarding the corporate formalities required. The jury thus had no guidance on whether corporate formalities were actually followed. Beyond this, there was no evidence establishing Clark Farms failed to adopt and adhere to its articles of incorporation. *See* Iowa Code § 490.202. There was no evidence the corporation failed to adopt and adhere to corporate bylaws. *See* Iowa Code § 490.206. There was no evidence showing the company failed to maintain a registered office and agent. *See* Iowa Code § 490.501. There was no evidence

establishing the company failed to hold an annual meeting or take other appropriate action. *See* Iowa Code § 490.701. There was no evidence the corporation did not have a board of directors and officers. *See* Iowa Code §§ 490.801, 490.840. There was no evidence establishing the corporation failed to issue shares. While there was no evidence Clark Farms actually followed any these formalities, it was the plaintiff's burden to prove Clark Farms failed to follow corporate formalities and not Clark Farms' burden to prove it did follow corporate formalities. The absence of evidence is not the evidence of absence. *See Cass*, 2006 WL 229033, at *4-5 (holding the plaintiff failed to generate a disputed issue of fact where the record was silent as to most formalities and noting the failure to follow formalities generally is insufficient to impose personal liability on a shareholder).

The only relevant evidence regarding corporate formalities showed Clark Farms did in fact follow corporate formalities. Clark Farms filed its articles of incorporation with the Secretary of State. "The secretary of state's filing of the articles of incorporation is conclusive proof that the incorporators satisfied all conditions precedent to incorporation." Iowa Code § 490.203(2). Clark Farms regularly filed its biennial reports. While Clark Farms did miss one filing resulting in the administrative dissolution of the corporation, Clark Farms successfully applied for reinstatement. The mere fact that Clark Farms was administratively dissolved is not material to the question. This is because the entity continued as a separate legal entity following administrative dissolution and the reinstatement related back to the date of dissolution as if it had never occurred. *See* Iowa Code § 490.1421(3) ("A corporation administratively dissolved continues its

corporate existence . . ."); Iowa Code § 490.1422(3) ("When the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution as if the administrative dissolution had never occurred."). The evidence also showed Clark Farms maintained separate books and separate finances from Clark. Clark Farms and Clark filed separate tax returns. In sum, there is just no evidence in support of the majority's conclusion.

Finally, the jury was also asked to consider whether the corporation is merely a sham or used to promote fraud or illegality. There is no evidence of either. Clark Farms had been in business for twelve years at the time of this transaction. It had over $1 million in assets. It had an office. It had equipment to conduct its business. In this case, the company brought a dredge and other equipment to the job site. Clark Farms had employees, and it paid its employees. Clark Farms filed tax returns with the assistance of a professional accountant. It was experienced enough in the industry to obtain a contract with Minger Construction. The majority does not bother discussing this factor because the only thing that can be inferred from this record is that Clark Farms did not perform its contractual obligations in this case. The mere failure to perform a contract is an insufficient reason to impose personal liability on a shareholder for the corporation's obligations. *See Campisano v. Nardi*, 562 A.2d 1, 7 (Conn. 1989) (holding the mere breach of a corporate contract cannot of itself establish the basis for imposing personal liability).

There is simply no basis to impose liability on Clark for the corporation's obligations under the record in this case. The majority's opinion is at odds with the evidence, the equitable and remedial principles underlying the rule, and a

legion of cases declining to impose personal liability on similar facts. *See, e.g.*, *Nw. Nat'l. Bank of Sioux City v. Metro Ctr., Inc.*, 303 N.W.2d 395, 398-99 (Iowa 1981) (reversing judgment where there was no evidence of undercapitalization and companies maintained separate financial records); *King v. Wilson*, No. 13-2018, 2014 WL 6681609, at *2 (Iowa Ct. App. Nov. 26, 2014) (holding there was no basis to impose personal liability where corporation was in business for fifteen years and the plaintiff failed to show the corporation was undercapitalized, did not follow corporate formalities, and did not maintain separate financial records); *CCS, Inc. v. K & M Enterprises, L.L.C.*, No. 12-1213, 2013 WL 751284, at *3 (Iowa Ct. App. Feb. 27, 2013) (affirming grant of summary judgment where the plaintiff "presented no evidence to support assertions that K & M was undercapitalized; lacked separate books; failed to keep separate finances, or paid individual member obligations; or failed to follow corporate formalities").

For the foregoing reasons, I respectfully concur in part and dissent in part.